The STATE of Oklahoma ex rel. OKLA-
HOMA BAR ASSOCIATION,
Complainant,

v.

O. B. MARTIN, Respondent.

No. S. C. B. D. No. 2019.

Supreme Court of Oklahoma.

Sept. 14, 1965.

As Amended on Denial of Rehearing
Nov. 9, 1965.

Application for Leave to File Second Petition
for Rehearing Denied Feb. 7, 1966.

Harry G. Foreman, John T. Spradling,
Oklahoma City, for complainant.

Cargill, Cargill, Chiaf, Rudkin & Car-
gill, M. A. (Ned) Looney, Oklahoma City,
for respondent.

JACKSON, Vice Chief Justice.

At the direction of the Executive Coun-
cil of the Oklahoma Bar Association, a
formal written complaint was filed with
the Executive Secretary of said Associa-
tion charging respondent herein, O. B.
Martin, with eleven specific counts of what
is now commonly called "ambulance-chas-
ing", or solicitation of personal injury or
workmen's compensation cases, either in
person or through a "runner". See 67
A.L.R.2d 859. The complaint was referred

to Grievance Committee No. 7–C of said Association, and after hearings at which respondent appeared with his counsel, the Committee made its report to the Executive Council in which it in effect found that respondent had indulged in four specific instances of "ambulance-chasing" (counts 1, 4, 8 and 11). The Committee recommended that respondent be reprimanded for such unprofessional conduct.

The Executive Council concurred in the findings of fact and conclusions of law of the Committee, but did not concur as to the disciplinary action recommended. It has now filed its report in this court in which it recommends that respondent be suspended from the practice of law indefinitely, with the right to apply for reinstatement after four years upon a showing of rehabilitation. All proceedings have been in accordance with Article VII, Part 1, of the Rules Creating, Controlling and Regulating the Oklahoma Bar Association.

 There is no dispute as to the applicable rules. It is agreed that charges of professional misconduct must be established by a preponderance of the evidence; that on a charge of solicitation through a lay person or agency, it is not necessary to prove that such lay person or agency received compensation; and that generally speaking the rules of practice in civil proceedings are applicable. Article VII, Part 1, Section 16, Rules Creating, Controlling and Regulating the Oklahoma Bar Association. It may be noted also that under Section 20(d) of the same Article, this court will adopt a finding of fact of the Executive Council unless the same is not supported by a preponderance of the evidence.

In this court, respondent's arguments consist chiefly of an attack upon the sufficiency of the evidence.

We find it unnecessary to set out in detail the course of events as to each count. In each one there was an initial contact either in person or by phone, by some person other than Mr. Martin, in which unsolicited advice to retain Mr. Martin was given, or in which a blank form of contract on which Mr. Martin's name was printed was signed by the person being solicited. In the case of count 1, this person was never identified. In count 4,

he was identified as a Mr. Z. Stevenson, who appears to have been a part time preacher in Lawton. Prior to the hearing before the Grievance Committee, Mr. Stevenson gave a statement to a Bar Association investigator in which he said:

> "* * * My deal with Martin is $20.00 per day and expenses. I am expecting to share in the final settlement. Mr. Martin came down and saw these parties after I called him long distance. * * *".

At the hearing, Stevenson admitted signing this statement but denied that he read it before doing so. There is also in the record a letter which came from respondent's office files, and which he said came from Mr. Stevenson, in which Stevenson said (We quote verbatim therefrom as follows):

> "This is to Say Mr. C (illegible) wouldn't give me a dime of that money from now on When you settle your cases please hold out are collect my part of The money
>
> * * * * * *
>
> "So i am Depend on you to Let me no in Time are collect for me. i would apreacate it very much. * *".

In the case of counts 8 and 11, the person making the original contact was never positively identified, but, from the descriptions of the "contact man" contained in the record, it could not have been respondent. In count 8, the man represented himself to be Mr. Martin, the respondent. He procured the signing of a contract of employment on which the name of respondent was printed. At that time the prospective client (a Mrs. Couffer) delivered to him two insurance contracts; these contracts were later found in an office file of respondent which he furnished in response to a subpoena duces tecum. Also in that file was a letter purportedly written by Mrs. Couffer as a letter of enclosure in which she enclosed one of the two policies; the letter also referred to "the other policy which I sent to your office". Respondent testified that he received one of the policies with the letter of enclosure, but was not sure how he had received the other. Mrs. Couffer would neither affirm nor deny that the letter of enclosure (dated some six years earlier) was

in her handwriting; however, she could not remember writing it and said that it was not written in her "phraseology" or "normal way of writing". It was apparently respondent's theory that his connection with Mr. Couffer stemmed from the letter of enclosure found in his office files.

However, there was evidence that about three weeks before the date when Martin said he received the letter and insurance policy from Mrs. Couffer, and two days after the "contact man" visited Mrs. Couffer, the agent of the insurance company which had issued the policy had been called on successive days, first by a Mr. Canavan and then by the respondent, Mr. Martin. Canavan made inquiry about the policy and insisted that the company's payments under it were too small. When Martin called the next day the agent remembered Canavan's inquiry. In the course of their conversation, Martin told the agent that the Couffers had instructed him to file a lawsuit, and that Canavan "was interested in it too". It does not appear that Canavan has a license to practice law in this state.

In his own testimony, respondent identified Mr. Canavan as the owner of a collection service for whom he had done legal work. He also said that Canavan had done some special investigations for him. He said that Canavan "could have" brought him the insurance policy concerned in count 8 and that the handwriting in the "blanks" on the attorney-client contract Mrs. Couffer signed when the "contact man" visited her looked like Canavan's handwriting. He said he used a form of attorney-client contract which was printed in book form; that he had never given any of the forms to Canavan but that Canavan might have picked them up in his office. He said he had been in Hominy (where the Couffers lived) "about that time" to take a deposition in another matter; that he had gone to Hominy with Canavan in his car; that Canavan had some notes to collect from people in that area, including the Couffers; that when Canavan talked to them about the note "they owed to this bank", they said they didn't have the money and told him about the insurance contracts on which they thought the insurance company owed them money. He thought that Canavan might have introduced him to the Couffers, but was not sure.

However, in a deposition taken about two weeks after respondent gave the above noted testimony, Mrs. Couffer testified that the man who came to her house identified himself as O. B. Martin, that he said he was an attorney and "in the insurance business to collect policies where people had been abused by companies that didn't pay off". She denied that the man identifying himself as Martin ever tried to collect money either from her or for her. She said that he came back about two or three weeks later and told her that "he had found out that he was out of his jurisdiction and the Bar Association was after him" and asked her not to tell anyone he had been there.

It appears that Leo J. Canavan was not available for questioning or for identification by any of the witnesses in this matter.

The prospective client in count 11 was Fred Landrum. He testified that he had an industrial injury and that a stranger who never identified himself by name came to see him in the hospital and later came to his home. At the home, he gave Landrum a blank "form 3" with the name, address and phone number of O. B. Martin written on the back and told him to "go see this man". He also had Landrum sign three blank "form 3's" and asked him if "any more of the boys got hurt", and Landrum gave him the names of two of them. He gave Landrum ten dollars. Later Landrum went to Martin's office in Oklahoma City to talk to him about his injury. It appears that his leg was in a cast and he did not want to drive his automobile in Oklahoma City; he wanted someone to drive him to the doctor's office. While they were in conference, Martin received a telephone call and handed the phone to Landrum to talk. Landrum recognized the voice on the phone as that of the man who talked to him about his injury in the hospital and later at his home. Landrum asked for a ride to the doctor's office but was advised that it was near by and that he should just walk, which he did.

After a careful review of the record before us, we cannot say that the findings of fact of the Executive Council are not supported by a preponderance of the evidence, and we therefore adopt them as our own.

It is suggested in the brief of respondent that in the four counts in which he was found guilty, the attorney-client relationship

never existed between Martin and the parties concerned, and that the disciplinary action against him should therefore be dismissed.

■ While we do not agree that Martin did not act as attorney for any of the people involved, we find this argument to be immaterial. It is well settled that misconduct by a member of the Bar, in order to justify disciplinary action, need not occur while the relationship of attorney and client exists. For cases involving this situation, see State ex rel. Oklahoma Bar Ass'n v. Ablah, Okl., 348 P.2d 172; and In re Hicks, 163 Okl. 29, 20 P.2d 896.

■ Solicitation of business by attorneys is condemned in most, if not all, jurisdictions in this country. 67 A.L.R.2d 859. It is a violation of Canons 27 and 28 of the Canons of Professional Ethics of the Oklahoma and American Bar Associations. This court has specifically held that it is ground for disbarment, In re Durham, 190 Okl. 588, 126 P.2d 69, or for suspension from the practice of law, State ex rel. Oklahoma Bar Ass'n v. Hatcher, 201 Okl. 683, 209 P.2d 873.

An examination of the cases cited in the annotation at 67 A.L.R.2d 859 reveals that the discipline imposed in other jurisdictions for solicitation ranges from a simple reprimand or censure to permanent disbarment. The same is true in Oklahoma. In State ex rel. Oklahoma Bar Ass'n v. Hamilton, Okl., 274 P.2d 383, the respondent was reprimanded; in In re Durham, 190 Okl. 588, 126 P.2d 69, respondent was permanently disbarred from the practice of law. Many factors, unnecessary to set out here, have been considered by the courts in extenuation or aggravation of the offense. See 67 A.L.R.2d 872. The many and varied circumstances involved in the different cases make it extremely difficult if not impractical to formulate any rule of thumb to follow in deciding upon the appropriate discipline in a given case.

In the instant case the record does not disclose any misconduct on the part of respondent other than the solicitation charges. The record further discloses that respondent's services rendered in behalf of his clients who testified herein were satisfactory to them.

After a careful review of the record and briefs before us, and a thorough consideration of all the circumstances involved, we are of the view that respondent should be, and accordingly is, suspended indefinitely from the practice of law in the State of Oklahoma. However, we are of the further view that respondent should be privileged after two years from the effective date of this order, and upon application, to produce evidence to the satisfaction of the court that he has undergone rehabilitation, and it is so ordered.

HALLEY, C. J., and DAVISON, WILLIAMS, BLACKBIRD, IRWIN and LAVENDER, JJ., concurring.

HODGES, J., concurring in part and dissenting in part.